Good morning, Council. Ms. Huber, if you're ready, you may proceed. Good morning, Your Honors, and may it please the Court, Council, my name is Stephanie Fugger and I represent the appellant Gene Snapp in Eagle Ridge Townhouse Management, LLC. The trial court in this matter should not have granted summary judgment in response to the Galena Territory Association's motion because there are genuine issues of material fact in the record and facts about which reasonable minds could differ that should have precluded the grant of summary judgment. Now, the trial court did not articulate on the record or in the written order the bases for the grant of summary judgment, but I'd like to talk first about one of the arguments advanced by the Galena Territory Association, who I will refer to as the GTA, throughout the argument. Council, before you do that, let me just focus on what you just said. Obviously, there are two parts to, or really three, but we're concerned more with two parts to a defamation per se claim. One, a plaintiff has to plead and prove that the alleged statement was false or defamatory, and secondly, that the defendant published the statement to a third party. So in the motion for summary judgment at the trial level, did you understand both of these issues or elements to be involved or not? Yes, I do believe that both of the issues were involved, and there were a number of other issues, including whether privileges applied, whether there was a privilege, what the correct standard was, whether Mr. Snapp was to be looked at as a limited purpose public figure. So all of those sorts of arguments were raised in addition to those two. Okay. Thank you. So as I was saying, there are a number of bases that were raised at the trial court level that could have served as the court's bases for the — for granting the motion for summary judgment. Since the court did not articulate, we don't know, but I'd like to start with the GTA's reliance on the Communications Decency Act. Let me ask you a special question on that point. The trial court did not have, or arguably should have, articulated specific bases for the ruling. That does not preclude us from resolving the issues. We resolve and we review and reach a decision on the decision, the correctness of the decision, not its reasoning. Do you agree with that? Correct. I agree. Okay. My point in bringing that up was simply that there's been a number of arguments raised, and I'll go through each of them. I don't think any of them should have been enough for the court to grant summary judgment. And so there's several different defamatory statements that we're talking about. Some were posted to the GTA website, some were mailed out, and some were made in notes created by a GTA employee, which were then published to third parties. Let me ask a question about that. Okay. In any of those minutes, or in any of those campaign documents, was the name ever mentioned? In several of the campaign letters, Mr. Snapp was mentioned by name. And then there In whose? In Mr. Simpson's letters, there are references, I believe in the record, to one of the letters that talks about 53 specific references and letters. And actually, in the Counsel, if you could refer to the dates of the letters you're talking about, because we only have a minimal number of documents that are at issue here. The Simpson letter of February 11th, 2014, the earlier letter was beyond the statute of limitations. So I assume you're talking about that letter. The other letter, February 18th, 2011, was the Thieby letter. So I apologize for interrupting, but it would help the Court to have you refer in your answer to which letter you're talking about. Yes, Your Honor. Let me find for you the specific record site. I apologize, this is a voluminous common law record with three volumes. But it would be the ones that were involved in this litigation. I believe the Simpson letter of February 11th is at C-2403, C-2404. What I understand from the record is that there was a letter that was circulated during the initial time that Mr. Simpson was seeking election to the Board, which mentioned Mr. Snapp by name, I believe 53 separate times, and talked about Ms. Madrigan, and that was not precluded or barred by the statute of limitations. And there was reference in the other campaign letters to, for example, defaulting on a bank note, defamatory statements about what the Board did at a time when Mr. Simpson was President of that Board. And so those documentations, those letters that were sent out referred in inference and also directly to Mr. Snapp and to the management company that he was the member of. But those other letters are not an issue in this appeal, are they? We have the February 11th letter of Mr. Simpson, and Mr. Snapp's name, I mean, I've seen them just appear in that letter. All of the letters that were sent out by the Galena Territory Association are an issue in the appeal because it's part of our claim that the GTA, their act of republishing those is at issue. And so whether those were underlying, whether it was actionable underlying against the other publishers of those letters is not the specific focus of this appeal, but the GTA's act of typing out those letters, putting them into envelopes, putting labels on those letters, applying postage, and then ensuring that the 142 members of the Eagle Ridge Townhouse Association, which I will refer to as IRTA, got those correspondence. That's what's at issue in this defamation appeal. I just want to focus on one part of what you just said. You said ensure that the complaint and third-party complaint in paragraph 25, you allege the process of mailing the minutes to the IRTA homeowners. So I want to focus on the issue of mailing. Did GTA have any active role in actually mailing the minutes from the June 2011 and the February 2012 meetings to the membership? Yes. And what is reflected in the record with respect to that? Yes. So the February 25, 2012 meeting minutes, recall that at that time, the Galena Territory Association was not acting as the property manager for IRTA. And so when IRTA was having their board meetings, the GTA at that point wasn't their agent, hadn't been hired to do anything. And so at that meeting, Susan Miller, who was the Executive Director of Corporate Services, and Joe Mattingly, who was the CEO of the GTA, came to the IRTA board meeting and participated in the meeting, presented at the meeting, which was approximately three hours long. Susan Miller, the GTA employee, creates a summary of notes of what happens at the IRTA meeting. Then she creates the minutes to exclude. She decides how to phrase everything, how to highlight certain points. She, in her capacity as an employee of GTA only, because at that point she's not the agent or has any affiliation with IRTA, she creates those minutes. She sends them to IRTA for their review. They don't make any changes. And then GTA bails them out. But at that point, they are not, again, the agent of IRTA. So when they did that, they are acting as a republisher at that point, publishing those defamatory statements that they had a role in creating and developing the content of. Well, when you say they mailed them out, there's evidence in the record that they actually took them to a post office or dropped them in a mailbox? Yes, mailed those out. Okay. Do you believe there is? Did they prepare them for mailing, I think is the issue, or did they mail them? My understanding is that they were prepared for mailing by the GTA. Not that they actually dropped them in the box. I think they did both, and I think the record reflects that. Okay. Because they were responsible for creating and developing the content. They posted it to the site, as well as printed off physical copies that they mailed out to the 142 IRTA members. And recall, at that point, they would have no reason to be doing that. Well, then why did IRTA not make any corrections or say, wait a minute, this isn't your job? Why didn't the board say that? I don't know why. I think one reason is because the people that were then in control of the board, Ken Simpson and the others, had had a stated purpose of removing Mr. Snap and removing Eagle Ridge Townhouse Management Company. As the management company for a long time, their plan was realized. The GTA was back in the fold as the property manager, and they were content with that. You just said they weren't involved in any way at that meeting. At the June 2011 meeting, they weren't. They did the same thing and mailed those out. Okay. But was Mr. Snap on the board at that time? In the 2011? Yes. Yes. And didn't he have an opportunity to say, wait a minute, I don't agree with this? I think he did, but the makeup of the board at that point was such that his objections, if any, would have likely been overruled. Well, they might have been, but did he make an objection? Not that I'm aware of. All right. Trying to break this thing down into some of the underlying necessary elements, you're saying that GTA published the letters without justification or with malice, correct? I didn't hear that. Is that part of your argument, that GTA published the letters without justification or with malice? Yes. That's one of your threshold elements. Okay. If the record only shows that they stuffed the envelopes, they affixed mailing labels to them, how does that rise to the level of unjustified publication or with malice? Well, I think the record reflects that they typed out the letters, and so the act of typing it out and knowing exactly what the content was, stuffing the letters, putting the postage on, coupled with all of the other things that the record shows malice. For example, back in 2007, the CEO, Joe Mattingly, and the then president of the GTA went directly to Mr. Snap and said, hey, we think your management company has had enough time as a management company. GTA wants to come back in and be the management company. And then from that point, even before the elections in 2011, there's an email in the record from Mr. Simpson where he says, even before he knew what the to see if they would come back into the fold and be the management company. He was talking directly to Mr. Mattingly about that prior to Erdem, the Eagle Ridge townhouse management company, being fired. And so when you couple the act of stuffing all of the envelopes and mailing this out with all of those underlying things, it shows a plan of malice to remove and injure Mr. Snap and the Eagle Ridge townhouse management company. You're talking about typing the letters and mailing them. Are you talking about the campaign letters? The campaign letters. We're not talking minutes at this point. We're talking campaign letters. Well, that's part of it as well because those minutes contain defamatory statements about my client. All right. Well, one of the issues as I have reviewed this is GTA is not going to give up their list of property owners for privacy reasons, correct? Well, that's what they say. Well, do you have evidence that they do? No, I don't. But it's interesting in counsel's brief that that's one of the bases on which they claim that the motion for summary judgment was properly granted because of their privilege, which applies because of the Common Interest Community Association Act and the Not-for-Profit Act obligates an association to turn over certain records, including the names and addresses. But the interesting about that – But to whom? They don't turn them over to just anybody. They have to turn them over appropriately. To a member for a proper purpose. Correct. But my point about that is it's interesting that they're trying to rely on that obligation to provide a qualified privilege to the claims of defamation because that isn't what they did. They're trying to equate the stuffing of envelopes, the typing of these letters, the adding the labels and mailing them out to the ERTA association members with their obligation to potentially have their own association members be allowed to inspect records and books for a proper purpose. I think those are a far cry. Mr. Simpson had asked for them before that, before there was any election issue. He had asked for these items before that time. And according to this, the 805 ILC 105, 107.75, these entities, and in this case it would be ERTA, has to keep accurate books and records. And they can be turned over for a public purpose or a proper purpose. That request was denied many times, at least twice and probably more than we actually see in this record. The request to ERTA prior to that was denied, but at the point that Mr. But I just want to make sure we're not getting confused because Galena Territory Association is a property owners association for all of the people, the 4,800 property owners in the Galena Territory. And then there are also eight smaller homeowners associations. ERTA is one of them. And so, if I might finish this slide. So ERTA, what's at issue in this appeal is that the GTA is claiming that because Mr. Simpson made a request to GTA for its membership records that they were privileged, that the act of mailing everything out was privileged. Well, there's a couple of problems with that. First of all, if Mr. Simpson made a request to the GTA for its record roles for those 4,800 persons, they didn't turn it over. So why does that apply? At that point, the GTA, it's undisputed, was not the management company for in keeping a list of the ERTA members, which is what Mr. Simpson was actually after. Because the eight satellites are also part of the GTA. Everybody who lives there is part of the GTA. So the territory would have that information. And that would be a good central place to find that information if Mr. Snapp was not willing to turn them over. And prior to his becoming a candidate, Mr. Simpson hadn't gotten anything. Right. Right. But again, then I don't see how that ties into counsel's argument in the brief that that somehow privileges the act of stuffing the envelopes, typing out the defamatory letters, sending them out to the ERTA homeowners at a point when GTA wasn't the agent. Because they were asked to do that. And looking at this record, if I was in one of those entities and I wanted to have a block party and I wanted to have my neighbors, I don't know all their names and addresses. I could go to the GTA and say, will you send these invitations? Well, first of all, I say, will you give me the names? And they'll say no. Will you send these invitations? And they will say yes. I'll have to pay for it, but they'll say yes. Yeah, and there's a couple of points I would make about that. In the record, there was a request in 2007 made by an ERTA homeowner to the GTA for something similar. Hey, I'm having this homeowner's issue. Can I have the list so I can send it out? They refused to do that. And in the record, there is also evidence that they didn't require payment for all of these times that they performed these, quote, secretarial services. They did it on a number of occasions on a volunteer basis, I think, because they wanted to participate and contribute to this campaign to oust my client and the townhouse manager. And that's in the record as well? Yes. I was just going to ask, you can pinpoint where in the record, not this minute, but you can let us know maybe in your rebuttal. I will. There is a list of two specific instances where they were not charged. A list of two? No, there's a list of a number, but there are two in that specific list where they did not charge. One of those people was Mr. Simpson for the mailing of these things, so they did it on a volunteer basis. When he was a candidate or when they were back in management? I believe when he was a candidate. All right. You'll have an opportunity for rebuttal. Thank you. Thank you. Mr. Benkert? Thank you. Good morning, Justices. Good morning. May it please the Court. I am Peter Benkert, Brooks Law Firm, representing the defendant, F. Hallie, last remaining defendant, as all other defendants and authors of the defamatory statements have since been dismissed with prejudice due to settlement. There's a lot here, and I will do my best to get to as much of it as possible. Can I make a suggestion? Yes, sure. I was thinking the same thing before you stood up. There's a lot of moving parts, so to speak, in this action here. Correct. But it might be helpful to go back to the basic elements. To prevail on a claim of defamation in any case, a plaintiff must plead and prove that the defendant made a false statement about the plaintiff, one, the defendant made an unprivileged publication of that false statement to a third party, and the plaintiff sustained damages as a result of the publication. Do we agree those are the essential elements of this case? Yes, Your Honor. Yes, Your Honor. So in the course of your arguments to call out and summarize all of these moving parts, can you specifically address the defamation part, the publication part in light of her arguments? Why her argument is not going to be sustainable in this case? Yes, Your Honor. If I could possibly add to this at the beginning, if you could perhaps first focus on, with regard to the motion for summary judgment in the trial court, did you include or focus on whether any of the statements were not actionable because they were opinions or substantially true? In other words, the first element that Justice Hudson referred to, whether or not these statements were false. If so, let us know where those arguments could be found in the record. Or did you just focus on the second element, the publication, and then related to that, the immunity issues? Thank you, Justice. You know, yes. The first part of your answer is no. We did not address the actual truth and those types of, the first element of defamation. We did not address those in our summary judgment motion. I believe there is, there could be the actual speakers, all other various co-defendants did make arguments to that effect. Arguments like that may be in the record, but I perhaps would suggest that justices don't attempt to take to the phone to find those. And why, why was then, I assume, your focus on the issue of publication? The issue of publication is very important for the issue of our, for GTA as a party because they're being brought in for republisher liability. We are not, there is nothing in the record, it's undisputed, that no statement in the meeting minutes, no GTA member spoke those words during those meetings. No GTA spoke, wrote any of the letters. In fact, our counsel for appellant continues to refer to typing, which we've always set forth that that is not an accurate reflection of the record. Counsel continually indicates that the GTA typed these letters, when in fact the reference to the, stepping back for one moment. Throughout appellant's brief, in their statement of facts, there are 93 facts that they rely on. 70 of those facts are all referenced to their own pleas, which is not proper in the resistance to summary judgment. Most importantly, and most glaringly, the one, there's two pieces of the record that they do actually rely on and cite to. That's the definition of Susan Miller, the executive director of GTA at the time. The other piece of evidence that they refer to is the affidavits of Gene Snapp and Mary Snapp. Those are the only pieces of the record actually referred to, that would be considered admissible evidence and for consideration on summary judgment. As part of that, in reference to the Susan Miller deposition, the continued reference to typing is found at C-118-11, page 58, and that's the deposition of Susan Miller, volume one. The reference to typing is an example that Susan Miller is giving to, let's say, a softball question, a deposition as to what are the general services that the GTA may provide to its various eight different townhome associations. There's no specific question in that deposition, did you type these letters. In fact, referencing something that's not within any of the appellant's arguments is the affidavit of Ken Simpson, which is found in the GTA's, I believe, renewed motion for summary judgment, and that's at 1878, volume two. And in that, Ken Simpson indicates that he provided the GTA with paper to print his campaign letter. He also supplied the GTA with envelopes in which to place them. They printed copies. I provided stuffed letters into envelopes I provided. Also, you'll indicate that. If he provided the paper in the envelopes, what went on the paper? I mean, did he give them a flash drive? How did they get the letter? The letter itself was provided either, I don't know that it's clear in the record, but it would have been probably a flash drive, similar to going to Kinko's and indicating, here's a letter, please make copies. But in this instance, he also supplied Kinko's with paper. With respect to the February 25th, 2012 minutes of the annual meeting, does Susan Miller's deposition indicate that her role was not just to type the minutes, but she actually participated, as counsel indicated, in that meeting, in that annual meeting? The record is... And wouldn't that have changed the role of GTA with respect to those meeting minutes? No, I don't believe it does, Your Honor. She was at all meeting minutes, or at all meetings, a GTA staff member is there. In this instance, for the specific meetings that you're questioning, about February 25th, 2012... That's the annual meeting. Annual meeting. She was in attendance. She transcribes the meetings. She sits there, takes notes. I believe there's also a reference to an audio tape being kept. She's there essentially as a secretary. If she does present anything at the meetings, it's as the general property manager. Most importantly, and I think what needs to be the specific focus of this Court, is the actual defamatory statements that are said, the defamatory statements at issue, were not spoken by Susan Miller. They were not spoken by anyone but the other individual URTA members, Ken Simpson specifically. Well, but that goes to the issue of the fact that GTA was a republisher. You indicated, right, we're not starting beyond that, or before that. But, I guess I just lost what I was going to... The other thought that I had, I'm sorry. Does a GTA member or official... You want to do it first? No, go ahead. I'll write it down. Does a GTA official attend every annual meeting of the eight satellites? I don't know that, but I believe the record indicates that typically if they are, if part of their duty, if part of the a la carte menu that they provide their associations, if that association is selected to have the GTA there to transcribe meeting minutes, then yes, she would. But they, if I understood counsel correctly, and if I looked at, and if I feel through the record, they were not the management company for IRTA at the time, on February 25, 2011. They were at the time. February 25, 2012, they were the management company. I'm sorry, I'm going to pull back for just one second. There are June 25, 2011 meeting minutes. The record is to those meetings, GTA was not, they may have been present, but an IRTA member transcribed those meeting minutes, sent it to their IRTA board, all GTA did with those minutes is receive them from the IRTA board and then put them on the website. For the February 25, 2012 meeting, Susan Miller was there, did transcribe the meeting, sends those to the IRTA board for approval, they edit, or do not edit, I believe counsels will on rebuttal indicate that no editing indicates that they, that the IRTA does somehow, GTA created them. However, it's a simple transcription. Again, that's going to cause a rebuttal, but I will remind the court to look at SNAP's fourth amended counterclaim, and you can look through the 405 paragraphs of allegations in there, and you'll find that it was actually SNAP who alleges, specifically in a verified allegation, that the GTA, Susan Miller transcribed those meetings. There's no dispute she transcribed those meetings.  quote, And what she did constituted them being an information content provider. I mean, why isn't there at least a material question of fact as to that? The material question of fact is not, does not arise in this case because the actual issue that this Court needs to focus on is the defamatory statements at issue. She did not create those statements. Those are a word-for-word transcription of the other third-party defenders. So where in the record comes that? Well, I think it's important to point out to us, if you're talking about each of these couple statements in the letters, and you're saying there is information in the record that points to the fact that as to those couple statements, she just typed it verbatim, that there is information in the record that substantiates that. I'm sorry. I didn't mean the whole thing. That was to put my own place card in my mind, I didn't mean to suggest. The places to the record are, again, Ken Simpson's affidavit, 1878 and 1879, which he indicates that the February 25, 2012 meeting minutes were accurate and contained statements made by the IRTA members at the 25-2012 statement. I think also, very importantly, there's no allegation and there's been no fact or tribal fact raised by SNAP that any of these statements were not specifically stated. In fact, the liability of the co-defendants, who have since been dismissed with prejudice, was based on their statements, and their speaking those words during those meeting minutes. So to now say somehow that the GTA spoke them is the only way that they can reach these issues. No, but there could be a republishing issue. So as you alluded to at the beginning of your argument, there's a lot of moving parts, a lot of documents, a lot of issues. How do you respond in summary form to opposing counsel's overarching allegation that GTA made false statements about the plaintiff and then made an unprivileged publication? How would you, in a conversation, refute those allegations, based on the evidence in the record? Based on the evidence in the record, number one, there are, there is no evidence in the record. There is no trial of issue of genuine material fact in the record that the GTA spoke, created, otherwise independently authored any statement in a campaign letter. They did not speak any of the statements at the meetings. None of this was a statement from the GTA. Let's assume that's true for the sake of the argument, as it were. How does that bear in publication? They may not have created these allegations or this information. Did they ever actually, within the meaning of the law, publish the allegedly false statements? Two responses to that, Your Honor. Number one, the Communications Decency Act removes that element of publication. They did, in fact, put those meetings on the website. However, those meeting minutes were the property and the creation of IRTA and those IRTA members. By placing, and the Communications Decency Act specifically provides a prescribed liability based on that. If it's someone else's statements that you simply put onto your website, you do not have liability for that under tort. Specifically, cases reference that the CDA is the specific and perfect example to defamation defenses like this case. Just stopping there, we didn't clarify one point before you go on. It's also my understanding this was an ongoing obligation of IRTA to publish the meeting minutes, correct? Correct. And this has been going on throughout the course of history. Correct. And if I may, the record also shows that prior to the GTA becoming the property manager, SNAP would post his own meeting minutes. In fact, I believe it's 2009 he specifically asked the GTA to post his minutes, and that is since he simply provided the minutes. Prior to becoming the property manager, IRTA would create its minutes. They'd transcribe it, have it go through, and the creation process is not the transcription. Otherwise, any secretary of any homeowner association is going to be liable for defamation. They're just transcribing what took place and what was stated in the minutes. The creation process is the approval by the board saying, here it is, we don't have edits, we do have edits. Now, on vote, after a specific vote approving those minutes, here they are and we are specifically providing them for you to publish. In fact, that's part of the, I believe under the restatement second, it's part of the publisher responsibility is,  And that helps you provide that privilege. And here, How does that statute you just referred to provide immunity to this procedure? The Communications Decency Act or the restatement? Whatever you said initially that provided some immunity, you allege. The CDA. The Communications Decency Act provides immunity or prescribes immunity. I don't want to get too broad. The Second District has had problems and the Seventh Circuit has problems with claiming broad immunity. The CDA will remove the necessary element of publication from defamation when the person or party is a user or provider of an interactive computer service and they've published content of another information content provider. There is no dispute for the June 25, 2011 minutes, but the GTA did not transcribe them. The IRTA Board transcribed them, approved them, sent them to the GTA for publication. As to the February 25, 2012 meeting minutes, the GTA did transcribe them. However, they did not create any content. In fact, the CDA specifically provides a publisher, certain publishing rights, as in to editing, organizing. Those are the only types of claims, again, that SNAP has made, that the GTA organized. Somehow they created a three-hour meeting into digestible meeting minutes. May I finish? Finish your talk. How about the defamatory nature of these statements? Do you take issue with that, that these were false statements that were defamatory? The GTA would take issue with those statements in that it's never been proven and there was no opportunity and below there was no trial. The case settled to the underlying defendants. I believe they were performing voir dire at the time when they settled. So that issue has never been briefed or may have been briefed in the past, but it's never been. Again, the underlying argument of the GTA is the underlying truth or falsity, while false, which certainly precludes liability on the GTA. But even if they were true or even if they were defamatory statements, a republisher, they simply can't get to the GTA because of the CDA. The men were also conditionally privileged. For that instance, the court will look to the occasion. This is a townhome association election for the campaign letters and the mailing of these letters. SNAP used the same addresses to send his campaign letters out. The GTA sent these letters, which they did not author. They did not type. They simply affixed the mailing labels, as Your Justices have aptly found in the record, and stuffed envelopes. In some cases, there's reference to the record in Susan Miller's deposition that they were actually provided everything. The envelopes were closed. They didn't even need to stuff them. They were just putting a label on. Let me ask you this. Justice Enoff asked this initially, which is interesting. Assuming that, you know, there's no dispute they stuffed the envelopes, they transcribed it, is there any evidence they actually mailed them, published them? Do we know who actually mailed the letters? There's reference in the deposition testament of Susan Miller indicating, or I believe even in the Kent Substantive, there's only reference to mailing them out. I don't think there was ever any parsing that out as to does that mean they physically put them in. What I could only guess is that they affixed the postage amount, they affixed the label, and perhaps it went into a bucket with the rest of them. Would the plaintiffs have the burden of proving that the GTA mailed them? I would think that they would. Does, if, if we reverse this summary judgment, this matter would go back to trial? That's one of the most interesting questions you could have asked. And really, where does this go? And I believe that this is a perfect case where remand or reversal will serve no purpose. We go back to trial. Discovery has been closed for three years. At that point, they still, we have the GTA republisher, but yet every person who has spoken any of these statements, every other witness, party, any other individual in this case has been dismissed with prejudice at this point. The GTA will be, certainly either have to be calling these people back as witnesses, perhaps bringing them back into parties. Regardless, I think you'd raise Judge Kelly's blood pressure significantly if he was looking at another six years of litigation. Thank you, Counsel. Thank you, Justice. Ms. Fugate. I have a question that's hanging in the air. If the case were to be, if you were granted your prayer, reverse remanded, what would be the effective release that would be granted in another trial or entertainment? Well, the GTA would stand at trial for the conduct that's been alleged, and we would have a trial. In reasonable minds, I think the overarching point of this appeal is that there are genuine issues of material fact that should go to a jury, and the jury should have the opportunity to resolve those factual disputes. What would they be? Exactly. She typed it? Somebody typed it? What would they be? What would these material issues be? Give me a list. Okay. Give us a list. So the material issues would be whether or not the GTA is an information content provider with regard to the minutes that are posted on the website. I think it's interesting, this idea of a verbatim transcription. It isn't. There's no possible way that it could have been, and Susan Miller testifies in her deposition that is part of the record that she did not use the audio recording to create the notes, to create the official minutes. She used her own notes. And we all know that if you're in charge of deciding, synthesizing the information of a three-hour meeting and deciding what to put in, what to exclude. So if you're picking and choosing, you're saying, and editing, if you will, it isn't something like she took an audio recording. Exactly. Exactly. And so that makes her responsible for, that makes the GTA responsible as the information content provider. That's an issue of material fact. Number two. Another issue of material fact is that, okay, we get into several issues, but first it's our position that the trial court incorrectly determined Mr. Snapp to be a limited purpose public figure. But even if the trial court was correct and you affirmed that decision, the question of fact of whether there are sufficient material factual allegations to get to the jury the issue of actual malice on the part of the GTA towards Mr. Snapp, there's sufficient evidence of that. In the record there is evidence of the ongoing campaign that the GTA participated in to become the management company again. There's information in the record to show that Susan Miller directed a photographer to go to Mr. Snapp's house for 650 days consecutively to take photographs for the purpose of assessing a $200 a day fine. The GTA went out and removed flower beds and picnic tables that had been at Mr. Snapp's home for decades. All of those factual allegations get to the actual malice on the part of the GTA, and that's something that should go to the jury, and they should have an opportunity to determine whether they believe that the GTA exhibited actual malice. Actual malice that they complied with their rules. I'm assuming you're saying that these things were removed, these pictures were taken, and because they alleged a violation of some GTA rules. Some new rule that had been passed, a cat rule, specifically as a result of these issues with Mr. Snapp for the purpose of essentially catching Mr. Snapp and being able to assess a daily fine to him, which would again go to malice. Do you have evidence that other people fell prey to these rules as well? No. Did you look for it? I believe that there was discovery about that, and I believe that the Snapps were the only people that were identified. And I also want to just circle back to that list of the people that the GTA provided, quote, secretarial services for. I don't have an actual page number. It is in the record. It was in response to an interrogatory question that was served on council about all of the people who have asked the GTA to provide secretarial services, and there is a list of people, and next to it indicates whether payment was requested or not. And a couple of those, Mr. Simpson in particular, was not charged for that. And it's where? And where is that? It's an answer to interrogatory. I believe it was attached to our resistance to the motion for summary judgment as an exhibit. Is it possible? Council said that on one occasion, or at least on one occasion, Mr. Simpson put everything in the envelope. He sealed the envelope. He put the stamp on, and all he needed was the label. I don't believe that that's what the record will show. I believe that he hired or, in at least a couple instances, the GTA volunteered to do those things, not for hire. There is a postage meter that has a specific code that shows that it was mailed out from the GTA. Mr. Snap himself received that mailing, which would indicate and be proof that the GTA actually undertook the mailing of it and did mail those out. But is that proof that they volunteered to do it? Well, I think in their own answers to interrogatories that have been circulated, they indicate that they didn't require payment for some of those transactions. All right. Is there anything else on that list? With regard to the ‑‑ there is sufficient evidence in the record of the intentional interference count that was dismissed, sufficient factual disputes about that there was evidence that the GTA interfered with the contract between URDM and URTA by having discussions with Mr. Simpson before URDM had ever even been fired as the management company, before the elections took place. The 2007 conversation where they directly told my client, Mr. Snap, that they wanted back in as the GTA manager and that URDM shouldn't be the property manager anymore. What is the material question of back there with reference to that? I don't know why the trial court dismissed that count. There are sufficient material allegations and dispute that would tend to suggest that there was interference with the business relationship. GTA clearly knew about the business relationship between URDA and URDM and then interfered with it. Are these your allegations in your complaint or are these answers to interrogatories? Are they in depositions? Are they somewhere that established that these things occurred? Well, let's go back to the information content provider material fact. No, just this one. Oh, just this one. Yeah. Mr. Simpson's email specifically says that he talked to Mr. Mattingly at the GTA and that's been an attachment in the record. And the problem with that is that he shouldn't have been talking to the GTA? Why can't a member of the GTA talk to the GTA? Well, there's no problem necessarily as a premise that two people have a conversation, but when it's going to the fact of can you provide management services and then the GTA saying, yes, these are the things that we can do. When they know that there's at this point a business relationship between URDA and URDM, yes, that is a factual dispute that should go to the jury about whether that's interference. Well, could that also, did they tell them fire them and we'll come in or did they just say, did Mr. Simpson say if in the chance I become president or if I become a member of the board, would you be interested in coming back as our property manager? They did not use the words fire them and we'll come in. But I think when you look at the history of what they did say overtly to Mr. Snap about wanting to come back in because they thought that URDM had run its course, then you couple that with the actions that were taken, it raises this factor of material factual disputes that should go to the jury. And who said that to Mr. Snap? Mr. Mattingly, the chief executive officer, and Mr. Peterson, who was the then president of the GTA, they had a meeting with Gene and Mary Snap where both of them were present and heard those things said. And we have that in an answer to an interrogatory or in Mr. Mattingly's deposition. We have that in affidavits from Gene and Mary Snap about that conversation. Is there anything else on the list? I just would make one point in response to counsel's argument about the CDA. Assuming the CDA provided immunity, and I don't concede that at all. In fact, I think it doesn't. But let's just say that it did provide immunity for the posting of those minutes on the website. How does that in any way afford immunity for the actual publishing of the Dave Oldenburg notes, who is a GTA employee, had notes where he describes allegedly my client was utilizing strippers, was using illegal drugs, and then those are published to the URDM members by a GTA employee. The CDA doesn't speak to that conduct because it's not posted on a website. Mr. Oldenburg is a resident also of the Galena Territory, correct? Yes. He's not just an employee. I believe he is a resident, is my understanding. And what is his capacity as an employee? I don't know specifically, but at the time that he made those notes, he was an employee. And Susan Miller, the Chief Executive Director of Corporate Services, indicated that she knew those notes were kept at the GTA. And then those notes somehow got to Mr. Simpson. I think that raises a factual dispute about whether the GTA intentionally did that. Then they published those notes to the rest of the URDM members. But there's nothing in the record that actually would help us figure out or establish how those records got to Mr. Simpson, is there? Well, I think Susan Miller's sworn deposition testimony that indicates that she knew that they were kept there, and that was the only— But she didn't testify as to how they got to Mr. Simpson, so there isn't anything in the record that would establish that. No, but I think all of the facts here that are in the record and a reasonable juror could find from the totality of those facts, especially considering GTA's motive to get back into the fold as a property manager, that there is sufficient facts that a juror could find that they intentionally gave those notes there. At the time of this controversy, Mr. Oldenburg was a member of the Architectural Review Committee, I believe. Is that correct? I think so. Is that a paid position? I don't know if that is a paid position. Is that a—what am I going to say? Is that an employee of the GTA, or is it a volunteer position? What do their bylaws say? The GTA's bylaws about the architectural— I don't think that it was a paid position and it was part of the GTA. I mean, I think they're prohibited from compensation unless some other sort of motion was passed or— Thank you, counsel, for your arguments today. We appreciate them. We will take the matter under advisement and we will enter a decision.